# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br><br>**vs.**<br><br>**BUDDY ROBERT POOR BEAR,**<br><br>**Defendant.** | **3:21-CR-30074-RAL**<br><br><br><br>**REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION, AND SUPPLEMENTS TO MOTION, TO SUPPRESS** |

In this adult sexual abuse case, Buddy Robert Poor Bear (Poor Bear) seeks to suppress certain statements and evidence on *Miranda* and Fourth Amendment grounds. His statements to one officer though are admissible because they were in response to routine "booking" information questions or to a permissible consent to swab "request" and were volunteered. But Poor Bear's statements to another officer may not be used at trial (except as impeachment) and the urine and preliminary breath test results are excludable (for all purposes) – matters the government concedes. The suppression motion should thus be granted in part and denied in part.

## BACKGROUND

On April 15, 2021, tribal officers arrested Poor Bear for aggravated sexual abuse and took him to the Rosebud Sioux Tribe Adult Correctional Facility. The next day, Matthew Tucker, a special agent with the Tribe, interviewed Poor Bear at the correctional facility.

Tucker began the interview by introducing himself as a special agent for the Rosebud Police Department, and said he wanted to visit with Poor Bear. Tucker advised Poor Bear, "Because you're in custody, I have to read you your rights," but, before doing so, needed "some personal information from you real quick." In response to Tucker's inquiries, Poor Bear provided his name, date of birth, and educational level and disclosed when he arrived at the facility, how he was feeling, and that he was alcohol and drug free.[1] Tucker then continued and the following colloquy ensued:

| | |
|---|---|
| Agent Tucker: | . . . Do you have a physical address? |
| Poor Bear: | Uh, well I was staying at one – thirty North Washington. Uhm, and I was just staying at my moms for a few days, you know. Uh, 'cause where I was staying at, one – thirty North Washington, |
| Agent Tucker: | Where's one – thirty North Washington? |
| Poor Bear: | Yeah, that's in Mission. |
| Agent Tucker: | Oh, okay. |
| Poor Bear: | And uh, that's where I'm living now. And that's where Celeste Beauvais lives, I just stay there occasionally. But she |

---

[1] Mot. Hr'g Ex. 15 at 02:18-05:13 (Aug. 5, 2022).

|                  |                                                                                                                                                                                                                |
|------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                  | doesn't want me drinking, so, that's why I was at my mom's house . . . .                                                                                                                                        |
| Agent Tucker:    | Okay.                                                                                                                                                                                                           |
| Poor Bear:       | - drinking.  I was going to stay at my friend's house, in Valentine, but, I -sh, I didn't.  I didn't do that, I should have just, I should have went to Valentine, I should have just stayed out of that, out of that area.[2] |

Afterward, Tucker read the *Miranda* warning from an advice of rights form.[3]  Poor Bear initialed the rights portion of the form but would not answer questions without a lawyer present.[4]  Rather than conclude the interview at that time, Tucker took a different tack:

|                  |                                                                                                                                                       |
|------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------|
| Agent Tucker:    | . . . Um, Bud, one of the other things that we do in these type of investigations, is we collect DNA.                                                  |
| Poor Bear:       | Okay.                                                                                                                                                  |
| Agent Tucker:    | Okay?                                                                                                                                                  |
| Poor Bear:       | All right.                                                                                                                                             |
| Agent Tucker:    | Um, is that something that you would,                                                                                                                  |
| Poor Bear:       | Actually, that's what I wanted, 'cause I, I was really worried when I first came here.                                                                 |
| Agent Tucker:    | Okay. And that, yep, that's                                                                                                                            |
| Poor Bear:       | 'Cause then I have to have, if something did happen, there' gonna be evidence.                                                                         |

---

[2] *Id.* at 05:15-06:11.

[3] *Id.* at 06:17-07:59.

[4] *Id.* at 08:00-08:32.

| Agent Tucker: | Right. |
| Poor Bear: | I know that, so. You know, nothing happened, but, I ne- |
| Agent Tucker: | Okay. |
| Poor Bear: | I need that evidence.[5] |

Agent Tucker explained the waiver for the buccal swab and how to collect samples. Poor bear swabbed his own mouth with Q-tips, gave them to Tucker, and the interview ended.[6]

## DISCUSSION

### 1. Pre-*Miranda* Questioning

Poor Bear claims that Tucker's question "Do you have a physical address?" violated *Miranda*. The question, Poor Bear says, preceded any advisement of rights and was "incriminating" because it placed him "at the residence where the alleged offense occurred."[7] The government argues that the question was for "routine biographical data," and not one "seeking information . . . directly relevant to the charged offense."[8] The government also asserts that to the extent Poor Bear's response was incriminating, he volunteered more information than Tucker requested.[9] The Court agrees with the

---

[5] *Id.* at 08:32-09:04.

[6] *Id.* at 09:40-13:30.

[7] Docket No. 35 at 2.

[8] Docket No. 36 at 7-8.

[9] *Id.* at 7.

government that the physical address question did not infringe on *Miranda* and Poor Bear's statements in response to the question should not be suppressed.

Reinforcing the Fifth Amendment, *Miranda* requires law enforcement officers to warn suspects of their rights before engaging in custodial interrogation.[10] Interrogation is any question, word, or action that an officer should know is "reasonably likely to elicit an incriminating response."[11] But, "not all government inquiries to a suspect in custody constitute interrogation . . . ."[12] Absent an intent to elicit information for investigatory purposes, an officer's initial questions related to administrative concerns fall within the "routine booking question" exception to the *Miranda* rule.[13] The exception permits questions such as "name, address, height, weight, eye color, date of birth, and current age . . . . to secure the 'biographical data necessary to complete booking or pretrial services.'"[14] Basic identification information of this kind "is not interrogation under *Miranda*, even if the information turns out to be incriminating."[15]

---

[10] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (failing to provide timely warning may lead to the prosecution's inability to use statements stemming from the interrogation).

[11] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[12] *United States v. Tapia-Rodriguez*, 968 F.3d 891, 894 (8th Cir. 2020) (quoting *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985)).

[13] *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).

[14] *Id.* (internal citation omitted).

[15] *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996); *see Tapia-Rodriguez,* 968 F.3d at 895 ("'A request for routine information necessary for basic identification purposes is

Poor Bear points out, however, that Tucker was an investigating agent rather than a booking or arresting officer, and that the challenged questioning took place while Poor Bear was in tribal custody (and already "booked"). Still, the routine booking question exception applies even though Poor Bear had been arrested and was in custody.[16] Tucker could ask for identifying and contact information, including whether Poor Bear had a physical address, without having to administer *Miranda* warnings.[17]

Moreover, the circumstances of the interview reveal that Tucker's intent was administrative rather than investigatory. In his initial questions, Tucker asked Poor Bear his name, when he came into custody, how he was feeling, if he took medications, his education, the languages he spoke, and finally if he had a physical address. Tucker

---

not interrogation' unless 'the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged.'" (quoting *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010))).

[16] *See United States v. Temple*, No. S1-4:15 CR 230-1 JAR (JMB), 2017 WL 7798109, at *23 (E.D. Mo. Oct. 6, 2017), *R&R adopted*, 2018 WL 1116007 (E.D. Mo. Feb. 27, 2018) (detective's question, after formal booking, asking where defendant stays, fell within scope of routine booking exception to *Miranda*); *United States v. Sepulveda-Sandoval*, 729 F. Supp. 2d 1078, 1089-90, 1101 (D.S.D. 2010) (non-arresting ICE agent's pre-*Miranda* question about defendant's current address, asked while defendant was in custody, was a "routine booking question" and exempted from *Miranda*'s coverage).

[17] *Tapia-Rodriguez*, 968 F.3d at 894 (asking defendant his name and whether he lived in the apartment were requests "for routine information necessary for basic identification purposes"); *see also United States v. Armstrong*, 39 F.4th 1053, 1057 (8th Cir. 2022) (investigator's question about defendant's employment, in drug conspiracy case, was a routine booking inquiry and not interrogation under *Miranda*).

testified that those questions were intended to gather contact information and establish Poor Bear's state of mind and ability to communicate.[18]  And Tucker testified that he already knew the circumstances of the arrest and that Poor Bear had likely just been visiting the situs of the alleged crime (in Sicangu Village) for "the last couple of days."[19] Poor Bear supplied a Mission address when asked, and clarified – himself, without any follow-up inquiry – that he had been "staying at his mom's house for the past few days."[20] Poor Bear's excessive response to a simple yes-or-no question – asking if he had a physical address – was volunteered.[21]  Volunteered statements, including custodial ones, made on the suspect's own initiative are "not subject to the safeguards of *Miranda*."[22]  So if Poor

---

[18] Mot. Hr'g Tr. 17 (Aug. 5, 2022).

[19] *Id.* at 25-26.

[20] Mot. Hr'g Ex. 15 at 05:15-05:28.

[21] *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997) (defendant's admissions as to her whereabouts on the day of the robbery was volunteered and thus not in violation of *Miranda* when agent merely explained that he wanted to ask questions concerning the events of that day); *see also United States v. Wallace*, 753 F.3d 671, 674 (7th Cir. 2014) (where defendant in custody asked by agent whether he wanted to make a statement, "to which the proper and expected answer would have been yes or no," but defendant instead "decided to blurt out an incriminating statement," this was a volunteered statement).

[22] *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989).

Bear's gratuitous statements were inculpatory, they were his own doing and he has only himself to blame.[23]

The record as a whole does not show that Tucker's pre-*Miranda* questioning was reasonably likely to elicit an incriminating response from Poor Bear. Rather, the questions Tucker asked Poor Bear were ones that fell within the booking or routine information exception to *Miranda* and are fully admissible at trial.

### 2. Post-*Miranda*

Poor Bear claims, as well, that Tucker's request for a buccal swab violated *Miranda* because the request was the "functional equivalent of express questioning."[24] The request sought only consent for cheek swabs, the government counters, and was not apt to engender an inculpatory response and be interrogatory within the meaning of *Miranda*.[25] The government additionally maintains that Poor Bear's statements, interjected before Tucker could finish asking for consent, were volunteered and beyond what Tucker was requesting.[26] The Court agrees – on both fronts.

---

[23] *See Wallace*, 753 F.3d at 674 ("We sometimes tell lawyers at oral argument: if a question by a judge can be answered 'yes' or 'no,' answer it 'yes' or 'no.' [D]efendant could have used such advice.").

[24] Docket No. 35 at 3.

[25] Docket No. 36 at 8.

[26] *Id.*

The Eighth Circuit has never held that *Miranda* warnings must be given before a request to search.[27]  But the established law of this circuit is that "consenting or not consenting to a search is not subject to suppression under *Miranda*."[28] The reason is simple: consenting to search is not an incriminating statement or evidence that is of a testimonial or communicative nature.[29]

In the interview, Poor Bear acknowledged understanding his *Miranda* rights but refused to answer questions without a lawyer present.  Tucker then let Poor Bear know that collecting DNA is often done in "these type[s] of investigations."[30]  Before Tucker could complete his question – on whether Poor Bear would consent to buccal swabbing – Poor Bear cut Tucker off and declared "that's what I wanted" and continued on, making several unsolicited statements.[31]  None of them were in response to interrogation, or its functional equivalent, or were procured in contravention of *Miranda*.[32]

---

[27] *Tapia-Rodriguez*, 968 F.3d at 895 (citing *United States v. Payne*, 119 F.3d 637, 643 (8th Cir. 1997)).

[28] *Tapia-Rodriguez*, 968 F.3d at 895 (citing *Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir. 1985)).

[29] *See Muniz*, 496 U.S. at 594; *Cody*, 755 F.2d at 1330; *see also United States v. Cooney*, 26 F. App'x 513, 523 (1st Cir. 2002) (surveying circuit cases).

[30] Mot. Hr'g Ex. 15 at 08:32-08:42.

[31] *Id*. at 08:46-09:04.

[32] *See Tapia-Rodriguez*, 968 F.3d at 771 (asking suspect "will you consent to a search of your bedroom?" was not interrogation); *United States v. Jackson*, 852 F.3d 764, 771 (8th Cir. 2017) ("'[V]oluntary statements of any kind' are not the product of interrogation");

### 3. Other Evidence

The government responded in writing to the initial motion to suppress.[33]  Later

on, Poor Bear moved to exclude certain later-discovered evidence in two supplements.[34]

The government addressed the supplements, and evidence discussed in them, at the

suppression hearing.[35]

Poor Bear's first supplement concerned the statements he made to RSTLES Officer

Chad Roe on April 15, 2021.[36]  The government conceded that the statements were

procured in violation of *Miranda*, could not be admissible as substantive evidence, but

could be offered for impeachment purposes.[37]  The Court agreed to recommend that the

---

*United States v. Crisolis-Gonzales*, 742 F.3d 830, 837 (8th Cir. 2014) (request for consent to search was not an attempt to elicit incriminating statements and defendant's statement in response was a volunteered, spontaneous admission); *United States v. Miller*, 19-cr-64 (MJD/ECW), 2020 WL 4060754, at *9 (D. Minn. May 19, 2020), *R&R adopted*, 2020 WL 4059888 (D. Minn. July 20, 2020) (defendant interrupted officer while being read *Miranda* rights and then again when asked about a buccal swab and made incriminating statements; held statements volunteered and not the functional equivalent of interrogation).

[33] Docket 36.

[34] Docket Nos. 37,44.

[35] Mot. Hr'g Tr. 3-9.

[36] Docket 37.

[37] Mot. Hr'g Tr. 4, 6-8.

statements be used to impeach Poor Bear should he testify contrary to them at trial (which the district court would decide).[38]

The second supplement dealt with the test results of Poor Bear's urine sample.[39] The government agreed not to offer the urine and preliminary breath test results for any purpose at trial or oppose the Court making such a recommendation.[40] That left the Court with one issue, having two subparts, to pass on: whether Poor Bear's statements to Tucker were the product of interrogation and breached *Miranda*.[41] The Court has already fully addressed this issue and answered it in the negative.

## CONCLUSION

Tucker questioned Poor Bear within the bounds of *Miranda*. Asking Poor Bear if he had a physical address was merely a request for routine "booking" type information and did not amount to interrogation. Tucker's interrupted and unfinished "request" for a buccal swab was not interrogation either. Nor did Poor Bear's comprehensive, and perhaps incriminating, responses to Tucker's simple questions make the questions interrogatory under *Miranda*. When it came down to answering specific questions posed to him, Poor Bear was his own worst enemy. Suppression of his statements to Tucker is

---

[38] *Id.* at 7.

[39] Docket 44.

[40] Mot. Hr'g Tr. 5-8.

[41] *Id.* at 8-9.

uncalled for.  But exclusion of the statements Poor Bear made to Roe is warranted (except to impeach him) and for both the urine and preliminary breath test results.

## RECOMMENDATION

In accordance with the authorities and legal analysis set forth in this report, and the record as it now exists before the Court, it is

RECOMMENDED that Poor Bear's motion to suppress and supplements to it[42] be granted in part and denied in part.  Suppression of his statements to Roe as substantive (but not impeachment) evidence and of the urine and preliminary breath test results (for all purposes) should be granted.  Suppression of Poor Bear's statements to Tucker though should be denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object to the same.[43] Unless an extension of time for cause is later obtained,[44] failure to

---

[42] *See* Docket Nos. 34, 35, 37, 44.

[43]*See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[44]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

file timely objections will result in the waiver of the right to appeal questions of fact.[45]

Objections must "identify[] those issues on which further review is desired[.]"[46]

DATED this 18th day of August, 2022.

BY THE COURT:

_____
MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[45]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[46]*Arn*, 474 U.S. at 155.